IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| UNITED STATES OF AMERICA,  )  | CR 06-403-TUC-CKJ(HCE) |
| Plaintiff,  )  | **REPORT AND RECOMMENDATION** |
| vs.  )  | |
| PABLO RODRIGUEZ,  )  | |
| Defendant.  )  | |

On July 24, 2008 this matter came on for hearing on Defendant's Motion to Suppress Statements for Miranda Violation and as Involuntary. (Doc. No. 120) For the following reasons, the Magistrate Judge recommends that the District Court deny Defendant's Motion.

I.  CHARGES

Defendant Pablo Rodriguez, one of four defendants[1], is charged in eleven counts of a seventeen count indictment with knowingly and intentionally Conspiring to Commit Hostage Taking (Count 1) in violation of 18 U.S.C. §371 and 18 U.S.C. 1203(a); four counts of Hostage Taking (Counts 2 to 5) in violation of 18 U.S.C. §1203(a); Being An Illegal Alien and Knowingly Possessing a Firearm and Ammunition (Count 9) in violation of 18 U.S.C. §§922(g)(5)(A) and 924(a)(2); knowingly and intentionally Conspiring to Transport Illegal

---

[1] Co-Defendants are Javier Cota-Palafox represented by Mr. Thomas Jacobs; Felipe Torres-Beltran represented by Mr. Edward Laber; and Said Contreras-Corral represented by Mr. Arthur Hutton.

1  Aliens for Profit (Count 13) in violation of 8 U.S.C. §§1324(a)(1)(A)(ii); 1324(a)(1)(B)(iii),
2  and 1324(a)(1)(B)(i); Transportation of Illegal Aliens for Profit (Counts 14 to 17) in violation
3  of 8 U.S.C. §§1324(a)(1)(A)(ii), 1324(a)(1)(B)(iii), and 1324(a)(1)(B)(i).  (Doc. No. 12).

4  II.  PROCEDURAL HISTORY

5     Defendant Pablo Rodriguez was arrested on January 25, 2006 and on January 26, 2006
6  Defendant appeared before Magistrate Judge Charles R. Pyle for an initial appearance.  A
7  detention hearing was held on January 30, 2006 at which time Defendant was ordered held
8  by the undersigned Magistrate Judge.  (Doc. No. 4)

9     Defendant's Motion to Suppress Statements for Miranda Violation and as Involuntary
10 came on for hearing on July 24, 2008.  At the hearing two witnesses testified:  Agent Hector
11 Sandoval of the Department of Homeland Security Immigration and Customs Enforcement
12 (hereinafter "Agent Sandoval"); and Detective Paul Montaño of the Pima County Sheriff's
13 Department (hereinafter "Detective Montaño").  Introduced into evidence at the hearing
14 were: 1) a 44-page Spanish-English transcribed interview of Defendant conducted by Agent
15 Sandoval and Detective Montaño on January 25, 2006 (Government's Ex. 1); 2) a CD of the
16 interview of Defendant conducted by Agent Sandoval and Detective Montaño on January 25,
17 2006 (Government's Ex. 2); 3) a one page English-written Statement of Rights/Waiver
18 (Government's Ex. 3) and 4) a one page Spanish-written Statement of Rights/Waiver
19 initialed and signed by Defendant and signed as witnessed by Agent Sandoval and Detective
20 Montaño on January 25, 2006 (Government's Ex. 4).

21 III.  FACTUAL BACKGROUND

22    Defendant and Co-Defendants were stopped by U.S. Border Patrol on January 25, 2006
23 at approximately 5:00 a.m. on westbound Interstate 10 near Picacho, Arizona.  Defendant
24 was the registered owner of the vehicle he was driving when stopped.  In Defendant's vehicle
25 were seven Mexican citizens allegedly present in the United States illegally along with
26 various firearms and ammunition.

27    Agent Sandoval responded to the U.S. Border Patrol Station on Swan Road in Tucson,
28

1  Arizona to assist in conducting interviews in Spanish in reference to alien smuggling and a
2  possible homicide. (Agent Sandoval Testimony, p.9 hereinafter "Sandoval p.____").
3  Detective Montaño responded to the location where Defendant had been stopped and later
4  responded to the U.S. Border Patrol Station on Swan Road in Tucson, Arizona to assist in
5  conducting interviews regarding a homicide and kidnapping in Pima County. (Deputy
6  Montaño Testimony pp. 39-44, hereinafter "Montaño p.___") The interview of Defendant
7  on January 25, 2006 by Agent Sandoval and Detective Montaño began at 12:22 p.m. and
8  ended at 1:02 p.m. for a total of 40 minutes. (Government's Ex. 1). Agent Sandoval and
9  Detective Montaño both speak Spanish and interviewed Defendant in Spanish. (Sandoval,
10 p.10; Montaño pp. 58-59).

11 Agent Sandoval participated in interviewing Defendant along with Detective Montaño in
12 an interview room at the U.S. Border Patrol Station. (Sandoval pp.12-13) Agent Sandoval
13 was dressed in plain clothes, i.e., non-uniform clothing, and was not armed with a firearm.
14 (Id. at p.12) Detective Montaño was also dressed in plain clothes. (Montaño p.44) Detective
15 Montaño cannot recall whether he was armed during Defendant's interview. (Id. at pp. 44-
16 45, 55).

17 Agent Sandoval and Detective Montaño reviewed the transcription of Defendant's
18 interview and brought to the Government's attention that some questions asked and ascribed
19 to Detective Montaño were in fact asked by Agent Sandoval (Sandoval pp. 13-14; Montaño
20 pp.46-47). Otherwise, the transcription is correct. (Id.) The Spanish-English transcription
21 of Defendant's interview was admitted into evidence with no objection interposed by
22 Defendant as to its accuracy. (Sandoval p. 15) Defendant's demeanor during his interview
23 was calm; answers to questions were responsive; and Defendant appeared to understand
24 questions asked of him "[m]ost of the time." (Id. p. 16) Defendant was advised to tell his
25 questioners when he did not understand a question and did ask for clarification and was
26 provided with an alternative formulation for questions. (Id. p. 17; Montaño pp. 50-51).

27 The room in which Defendant was interviewed was "a little cool." (Sandoval p.17)
28 During the interview Defendant did not ask for water or food nor did he ask to use the

1  restroom. (Id. pp. 17-18, Montaño pp. 50-51) Defendant was not in leg or waist shackles
2  (Sandoval p. 35; Montaño p.44), and Detective Montaño cannot recall whether Defendant
3  was handcuffed. (Montaño p. 44) Defendant was asked preliminary questions eliciting
4  biographical information for approximately eight minutes. (Sandoval pp. 32-33) Defendant
5  was then given his *Miranda* rights which he read and initialed, and signed the waiver at
6  12:30 p.m. on January 25, 2005.[2] (Id. pp 32-33; Montaño pp. 47-48; Government's Ex. 4).

## IV.  DISCUSSION

### A.   *Miranda v. Arizona* Compliance

The Supreme Court in *Miranda v. Arizona*, 384 U.S. 436 (1966) held:

> ...the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.

*Miranda*, 384 U.S. at 444. A court must examine all circumstances surrounding an interrogation, however, "the ultimate inquiry is simply whether there [was] a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (*per curiam*) (quoting *Oregon v. Mathiason,* 429 U.S. 492, 495 (1977)). The circumstances of custody must be objective: "[T]he only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation." *Berkemer v. McCarty*, 468 U.S. 420, 442 (1984).

Herein, there is no question Defendant was in custody. Defendant had been detained at 5:00 a.m. on January 25, 2006 near Picacho, Arizona on westbound Interstate 10. He was found to be driving a vehicle registered to him and allegedly containing illegal aliens. He was

---

[2] Both the transcript and the CD recording of Defendant's interview indicate that the Spanish-written Waiver of Rights was not read by Defendant but rather he was asked to sign that portion of the form after being asked if he understood what he had previously read and if he was willing to talk to Agent Sandoval and Detective Montaño. (Government's Ex. 1, 2, 4)

- 4 -

transported to a U.S. Border Patrol Station in Tucson, Arizona. He was held there until 12.22 p.m., seven plus hours later, when he was taken to an interview room to be interrogated by Agent Sandoval and Detective Montaño. Defendant's "freedom of action was deprived in a most significant way."

Once freedom of movement is denied, *Miranda* requires specific procedural safeguards to be followed:

> Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed. The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently. If however, he indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning. Likewise, if the individual is alone and indicates in any manner that he does not wish to be interrogated, the police may not question him.

*Miranda*, 384 U.S. at 444-445.

Herein, after eight minutes of asking Defendant biographical information, Detective Montaño advised Defendant why he was being detained[3] at which time Defendant is advised of his rights under *Miranda.* (Government's Ex. 1, pp. 8-10) Defendant, after being questioned regarding his education and ability to read Spanish, read the Spanish-written Statement of Rights and initialed each after reading each. (Id. at p. 9; Government Ex. 4; Sandoval pp. 18-21; Montaño pp. 47-49). Defendant waived his *Miranda* rights and agreed to answer Agent Sandoval's and Detective Montaño's questions. (Government Ex. 1, p. 10) Defendant was aware that Agent Sandoval and Detective Montaño were investigating a homicide. (Id. at p. 29) Defendant denied any knowledge of a homicide and is quite taken aback that the illegal aliens being transported would say he was involved in such. (Id. at pp. 30-41). During this line of questioning, Defendant is told that once the interview is ended he

---

[3]Q. [Detective Montaño]:   Okay. Right now you are being detained.
A. [Defendant]:              Mmhmm (yes).
Q.                           Uh, for bringing undocumented people in the car. Okay?
A.                           Mmhmm (yes).

(Government Ex. 1, p. 8)

will not be questioned again, (Id. at pp. 34). This line of questioning continued and Defendant did not indicate in any manner that he did not wish to be interrogated or that he wished to consult with an attorney before speaking. At the end Defendant's interview he agreed to talk to Agent Sandoval again if Agent Sandoval had any other questions. (Id. p. 44)

B.   Statements Voluntarily Given

Confessions given voluntarily are admissible. 18 U.S.C. §3501(a), (e). Due process voluntariness takes into account the totality of circumstances in examining "whether a defendant's will was overborne by the circumstances surrounding the giving of a confession." *Dickerson v. United States*, 530 U.S. 428, 434 (2000). To that end, the following factors are considered:

> ...(1) the time elapsing between arrest and arraignment of the defendant making the confession, if it was made after arrest and before arraignment,[4] (2) whether such defendant knew the nature of the offense with which he was charged or of which he was suspected at the time of making the confession, (3) whether or not such defendant was advised or knew that he was not required to make any statement and that any such statement could be used against him, (4) whether or not such defendant had been advised prior to questioning of his right to the assistance of counsel; and (5) whether or not such defendant was without the assistance of counsel when questioned and when giving such confession.

18 U.S.C. §3501(b). In the case of a foreign national, such as Defendant herein, the voluntariness inquiry includes consideration of the following factors:

> ...(1) whether the defendant signed a written waiver; (2) whether he was read his rights in his native language; (3) whether he appeared to understand those rights; (4) whether he had the assistance of a translator; (5) whether his rights were explained painstakingly; and, (6) whether he had experience with the American criminal justice system.

*United States v. Gamez*, 301 F.3d 1138, 1144 (9th Cir. 2002) (*citing United States v. Amano*, 229 F.3d 801, 804-05 (9th Cir. 2000)).

The "delay" from when Defendant was first detained, 5:00 a.m., to when he was interviewed, 12:22 p.m., was not unreasonable. Both Agent Sandoval and Detective Montaño are Spanish-speakers and were needed to interview Defendant. (Sandoval p. 9; Montaño pp.

---

[4] 18 U.S.C. §3501(c) creates a six-hour "safe harbor" during which a confession will not be excluded because of delay.

1  41-42). Moreover, it was unclear whether prosecution of Defendant would proceed under
2  federal jurisdiction for alien smuggling, (Sandoval p. 9) or under state jurisdiction for robbery
3  and a potential homicide. (Sandoval pp. 9-10; Montaño pp. 39-40).

4  Defendant was driving a vehicle registered to him that allegedly held seven illegal aliens,
5  three of whom were in the trunk. It is fair to say that he had a very good idea why he had
6  been arrested. Moreover, eight minutes into his interview he was informed that he was being
7  questioned regarding alien smuggling and was then advised of his *Miranda* rights.

8  Defendant was fully and amply advised of his right not to make any statements and if
9  made, such statements could be used against him. Moreover, he was advised of his right to
10  counsel. Defendant during questioning neither invoked his right to remain silent nor asked
11  for counsel.

12  Defendant informed Agent Sandoval and Detective Montaño that he had finished high
13  school and reads Spanish, and Defendant read his rights out loud in Spanish to both of them.
14  (Government Ex. 1) Moreover, after reading each right, he initialed each such right.
15  Thereafter he signed his waiver of *Miranda* rights. (Government Ex. 4) Defendant did not
16  need an interpreter or translator because he was being interviewed by two fluent Spanish-
17  speakers. There is nothing to suggest that Defendant needed "painstaking" explanation of his
18  rights.

19  It is unknown what, if any, experience Defendant has with the American criminal justice
20  system.

21  By virtue of the Due Process Clause of the Fourteenth Amendment:

22  "...certain interrogation techniques, either in isolation or as applied to the unique characteristics of a particular suspect, are so offensive to a
23  civilized system of justice that they must be condemned...."

24  *Miller v. Fenton*, 474 U.S. 104, 109 (1985). Herein, police overreaching is non-existent. No
25  confession was extracted from Defendant through brutal torture, *see Brown v. Mississippi*, 297
26  U.S. 278 (1936); or through interrogation at length while incapacitated and sedated, *see*
27  *Mincey v. Arizona*, 437 U.S. 385 (1979); or through interrogation at length while on
28  medication and without food or sleep, *see Greenwald v. Wisconsin*, 390 U.S. 519 (1968); or

1 by officers holding a gun to his head, *see Beecher v. Alabama*, 389 U.S. 35 (1967); or by
2 being held for numerous days incommunicado and interrogated in a windowless cell with
3 limited food and coercive tactics, *see Davis v. North Carolina*, 384 U.S. 737 (1966); or by
4 inadequate food and medical attention until his confession was obtained, *see Reck v. Pate*, 367
5 U.S. 433 (1961); or by questioning by relays of officers over the course of days, *see Ashcraft*
6 *v. Tennessee*, 322 U.S. 143 (1944); or by his deficient mental condition rendering any
7 confession involuntary, *see Townsend v. Sain*, 372 U.S. 293 (1960), *overruled on other*
8 *grounds by Keeney v. Tomayo-Reyes,* 540 U.S. 1 (1992) *superseded by* 28 U.S.C. §2254, and
9 *Blackburn v. Alabama,* 361 U.S. 199 (1960); or by subtle forms of psychological persuasion
10 combined with Defendant's mental health issues which wrung a confession against his will,
11 *see Colorado v. Connelly*, 479 U.S. 157 (1986).

12 The Government moved to admit Government's Exhibit 1, the Spanish-English transcript
13 of Defendant's interview, and Government's Exhibit 2, an audio CD of the interview of
14 Defendant. This Court has reviewed the transcript of Defendant's interview and discerns
15 nothing in either questions asked or answers given to suggest overreaching or overbearing on
16 the part of Agent Sandoval or Detective Montaño. *Cf. United States v. Yida*, 498 F.3d 945,
17 950 (9th Cir. 2007) ("Transcripts of a witness's prior testimony, . . ., do not offer [the trier of
18 fact the opportunity to observe the demeanor of the witness], because 'all persons must appear
19 alike, when their [testimony] is reduced to writing.'") (*citing* 3 William Blackstone,
20 *Commentaries on the Law of England* at 374 (1768)). The Government's rationale for
21 moving to admit the audio CD of Defendant's interview was that "...the Court will have an
22 opportunity to consider the demeanor of all parties and the tone of the interview." (Sandoval
23 p. 16) This Court can only offer a partial assessment to the extent that voices are intelligible:
24 Agent Sandoval and Detective Montaño did not overreach or overbear in their questioning.[5]

---

26 [5]The CD is an audio recording of a cassette-tape interview of Defendant on January
27 25, 2006 from 12:22 p.m. to 1:02 p.m. As the CD nears what is the end of Side A of the
cassette-tape the voices are sped-up, high-pitched, and unintelligible. Once the cassette-tape
28 is flipped to Side B the voices on the CD are slowed-down, low-toned, and unintelligible.

- 8 -

## V. CONCLUSION

Based upon the reasons herein stated, Defendant's statements to Agent Sandoval and Detective Montaño were not obtained in violation of *Miranda* and were voluntarily given.

## VI. RECOMMENDATION

For the foregoing reasons, the Magistrate Judge recommends that the District Court deny Defendant's Motion to Suppress Statements for Miranda Violation and as Involuntary. (Doc. No. 120)

Pursuant to 28 U.S.C. §636(b) and Rule 59 of the Federal Rules of Criminal Procedure, any party may serve and file written objections within ten days after being served with a copy of this Report and Recommendation. If objections are filed, the parties should use the following case number: **CR 06-403-TUC-CKJ**.

Failure to file objections in accordance with Fed.R.Cr.P. 59 will result in waiver of the right to review.

DATED this 18th day of August, 2008.

_____
Héctor C. Estrada
United States Magistrate Judge